## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JANICE GODFREY,
       Plaintiff,

  v.

SOUTHERN YORK COUNTY SCHOOL
DISTRICT,
       Defendant.

1:17-cv-2335

Hon. John E. Jones III

## MEMORANDUM

### June 10, 2019

Plaintiff Janice Godfrey brings this action against Defendant Southern York County School District alleging age discrimination and retaliation in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq.* Presently before the Court is Defendant's Motion for Summary Judgment. (Doc. 21). For the reasons discussed below, we will grant the Motion.

## I.    MOTION TO STRIKE

Before we address the Motion for Summary Judgment, we must first consider Defendant's objection to Plaintiff's counter-statement of material facts, (Doc. 43), and request that the additional statements of fact, namely Paragraphs 59 through 114, be stricken from the record. Local Rule 56.1 tasks the moving party on a motion for summary judgment with filing "a separate statement of material facts, in numbered paragraphs, as to which the moving party contends there is no

genuine issue to be tried." Local Rule of Court 56.1. The non-moving party must file a separate statement of material facts, "*responding to the numbered paragraphs set forth in the moving party's statement of material facts and identifying genuine issues to be tried.*" *Id.* (emphasis added). Here, Plaintiff filed such a responsive document, but appended dozens of additional paragraphs setting forth her own statement of material facts. Such a statement "is neither contemplated nor permitted by the Local Rules." *Armenti v. Tomalis*, 1:12-cv-2039, 2016 WL 6493483, at *1 (M.D. Pa. Nov. 2, 2016) (Jones, J.) (quoting *Barber v. Subway*, 131 F.Supp.3d 321, 322, n. 1 (M.D.Pa. 2015) (Conner, C.J.)). Therefore, we will strike Paragraphs 59 through 114 of Document 43 from the record and will only consider Plaintiff's direct responses to Defendant's Statement of Material Facts.

## II.  FACTUAL BACKGROUND

The derive the following facts from Defendant's Statement of Material Facts, (Doc. 22), as supported by the record.[1]

Defendant is a public school district with administrative offices in Glen Rock, York County, Pennsylvania. (*Id.* at ¶ 2). In August 1978, Defendant hired

---

[1] Plaintiff denies several of Defendant's statements of facts based on, for example, an incorrect exhibit citation or the potential for an alternative inference. To the extent that Plaintiff does not dispute the *material facts* as stated by Defendant, or the record otherwise bears out Defendant's statements, we will construe the denials as admissions. However, we will, of course, consider the potential that a material fact could present contrary inferences.

Plaintiff as a temporary substitute to teach second grade. (*Id.* at ¶ 3). The following year, Defendant hired Plaintiff as a full-time first-grade teacher. (*Id.* at ¶ 4). Plaintiff earned tenure with Defendant in 1981. (*Id.* at ¶ 5). Prior to the 1982-1983 school year, Defendant transferred Plaintiff to a kindergarten teaching position at Southern Elementary. (*Id.* at ¶ 6).

In May 2001, Defendant implemented a Differentiated Staff Supervision Plan, which allows professional employees two options in choosing a supervision plan best suited to their professional development needs: clinical supervision and self-directed development. (*Id.* at ¶¶ 7, 8). Teachers required to participate in the clinical supervision mode include: (1) all professional employees once every four years; (2) all professional employees who change grade level and/or building assignments or return from a leave of one school year or longer; (3) all professional employees selected by the administration; (4) all professional employees new to Defendant; and (5) all long-term substitutes. (*Id.* at ¶ 9).

Sometime around the end of March 2016 and beginning of April 2016, Kimberly Hughes ("Hughes"), the then-acting principal at Southern Elementary, and Stephanie Winemiller ("Winemiller"), the assistant principal, began to discuss transferring staff. (*Id.* at ¶ 10). Hughes stated that the discussion was prompted, at least in part, by teachers not having a good working relationship with other teachers on their teams. (*Id.* at ¶ 11). Hughes said the transfers, hopefully, would

place teachers in areas where they could maximize their potential for the classroom, as well as maintain good relationships with one another. (*Id.* at ¶ 12). As a result of these discussions, Defendant transferred ten teachers, including Plaintiff, prior to the start of the 2016-2017 school year. (*Id.* at ¶ 14). Four of the ten transferred teachers were fifty years of age or older. (*Id.* at ¶ 15).[2]

Regarding Plaintiff, Hughes noted that when considering whether to transfer Plaintiff from kindergarten to second grade, they considered Plaintiff's elementary certification and early childhood certification, indicating that she was certified to teach second grade. (*Id.* at ¶ 16). Hughes and Winemiller initially notified Plaintiff of her transfer to second grade in the office of Southern Elementary School. (*Id.* at ¶ 17). They explained to Plaintiff that she was being transferred because she was friends with one of the second-grade teachers and because she had knowledge and experience with the Wilson Fundations Program, a reading program that was being implemented in second grade the following year. (*Id.* at ¶ 18).[3] This rationale for transferring Plaintiff was further expressed by Robert Bryson, assistant superintendent. (*Id.* at ¶ 20). In an email dated May 6, 2016, all

---

[2] Defendant cites to Exhibit 7 in support of this statement. Plaintiff denies the statement because Exhibit 7 does not show the ages of the four teachers, which is correct. However, Exhibit C to Plaintiff's own brief demonstrates this statement to be true.

[3] Here, again, Plaintiff denies the statement because of an incorrect citation. Defendant cites to Exhibit 3 but should have cited to Exhibit 2.

teachers at Defendant were notified of the transfers and the new teams for each grade level. (*Id.* at ¶ 19).[4]

On May 20, 2016, Defendant hired Catherine Scholles ("Scholles") to work as a teacher in the school district. (*Id.* at ¶ 21). Winemiller stated that, when they hired Scholles, they were not certain whether she would be placed in fourth grade or kindergarten, and that the decision would be based upon student enrollment. (*Id.* at ¶ 22).[5]

Plaintiff was assigned to clinical supervision for the 2016-2017 school year because she had been transferred to a new grade level and was also due for observation because it had been four years since her prior clinical supervision. (*Id.* at ¶ 23). On December 13, 2016, Winemiller and Jim Hollinger ("Hollinger"), the newly hired principal of Southern Elementary, conducted a formal observation of Plaintiff. (*Id.* at ¶ 24).[6] Plaintiff was one of several teachers who were formally observed that school year, as any new teachers not tenured or teachers who were transferred would have been observed pursuant to Defendant's policies. (*Id.* at ¶ 25). On the day of Plaintiff's formal observation, she conducted a math lesson.

---

[4] Defendant cites to Exhibit 8 but should have cited to Exhibit 7.
[5] Exhibit 7 indicates that Scholles was ultimately placed on the kindergarten team.
[6] Plaintiff disputes that the observation occurred on December 13, 2016, and suggests that it occurred on December 3, 2016. However, not only is the precise day immaterial, but the observation evaluation document itself indicates a date of December 13, 2016.

(*Id.* at ¶ 26). Winemiller stated that Plaintiff's teaching performance during the

observation was deficient.

> A. She had identified two standards for her lesson that addressed
> fourth grade content and that were fourth grade standards, which were
> not appropriate in the second grade classroom. And then throughout
> the lesson her instruction did not address those standards anyway. So
> what she implemented in the classroom did not match at all what was
> on her lesson plan. Her level of questioning was very low. All of her
> questions were recall questions. There was lack of routine and
> procedure in the classroom. A student had indicated that he did not
> know why they were going to math group, that they never go to math
> group but that they were on that particular day. There was no
> objective or essential question posted. The students didn't know the
> purpose of what they were doing.
> . . .
> A. Mrs. Godfrey was not monitoring the classroom. Because of the
> lack of procedures and routine and the lack of attention that she gave
> to students there were many students off task. There was another
> student who sat with her head down for almost 40 minutes until I
> approached her and sent her to the nurse. The assignments and
> activities that the students were doing did not align with the lesson or
> even one another. There was a computer station where children we
> replaying games that were not even math related. The students that
> were working on math work at their seats, many of them were doing a
> coloring page. That's everything ---

(*Id.* at ¶ 27). After the observation, Hollinger placed Plaintiff on an improvement

plan. (*Id.* at ¶ 28). Hollinger stated that he had concerns over the quality of

instruction and classroom environment of the children and that the improvement

plan was designed to provide support for Plaintiff and address those areas of

concern so that she could improve and grow. (*Id.* at ¶ 29). Hollinger believed that,

in his professional opinion, an improvement plan was necessary because the level

of instruction and classroom environment were far below a reasonable expectation. (*Id.* at ¶ 30).

Plaintiff received a letter from Hollinger dated December 14, 2016, stating that he wanted to speak with Plaintiff and Winemiller about the observation and that Plaintiff could bring representation to the meeting. (*Id.* at ¶ 31). Plaintiff met with Hollinger and Winemiller on December 16, 2016. (*Id.* at ¶ 32). Christopher Newland ("Newland"), president of the teacher's union, and Jennifer Collins ("Collins"), the building representative for the union, were also present at the meeting. (*Id.*). At the meeting, Hollinger and Winemiller informed Plaintiff that she had received a "needs improvement" rating as a result of the observation. (*Id.* at ¶ 33). The "needs improvement" rating did not alter Plaintiff's salary, pension, or any other benefits to which she was entitled as a professional employee. (*Id.* at ¶ 34). Plaintiff was further informed that she would be placed on an improvement plan. (*Id.* at ¶ 35).

The same individuals – Hollinger, Winemiller, Plaintiff, Newland, and Collins – met again on January 3, 2017, to review the Individual Improvement Plan. (*Id.* at ¶ 36). After the meeting, Winemiller drafted a memorandum summarizing the conversation held with Plaintiff during the meeting. (*Id.* at ¶ 37). On January 11, 2017, Plaintiff met with Hollinger and Hughes for a lesson design meeting, during which time Hughes discussed the curriculum maps and tips for

Plaintiff to use when she planned her lessons. (*Id.* at ¶ 38). After this meeting, Hollinger prepared a memorandum summarizing the conversations that took place. (*Id.* at ¶ 39).

On January 13, 2017, Plaintiff applied for leave under the Family and Medical Leave Act ("FMLA"). (*Id.* at ¶ 40). Defendant approved Plaintiff's FMLA request for leave from January 17, 2017, until April 14, 2017. (*Id.* at ¶ 41).

On February 13, 2017, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against Defendant for alleged age discrimination. (*Id.* at ¶ 42). Sometime in either February or March 2017, Winemiller became aware that Plaintiff filed an EEOC charge against Defendant. (*Id.* at ¶ 43).

Plaintiff returned to work upon the completion of her medical leave on or around April 14, 2017. (*Id.* at ¶ 44). On May 11, 2017, Hollinger emailed Plaintiff indicating that he was going to conduct informal walk-throughs until the end of the school year but would wait to resume Plaintiff's improvement plan until the following school year. (*Id.* at ¶ 45). At the beginning of the following school year, on September 8, 2017, Plaintiff met with Hollinger and Winemiller to discuss the improvement plan. (*Id.* at ¶ 46). At the meeting, Plaintiff was provided a copy of the January 5, 2017, improvement plan, which contained revised dates following her return to Defendant after her extended leave. (*Id.* at ¶ 47). During the meeting,

Plaintiff informed Hollinger that she may potentially retire from her position.  (*Id.* at ¶ 48).  On September 11, 2017, Hollinger drafted a memorandum, which was sent to Plaintiff, summarizing the conversations that occurred during the meeting.  (*Id.* at ¶ 49).  In the memorandum, Plaintiff is quoted as saying, regarding the improvement plan, "Well, Jim, I'm not going to do it.  I'm waiting on my attorney.  I'm sure you know I filed a complaint with the EEOC.  I'll turn in my letter, 60 days, I'll finish out the year, I'll do what I need to do."  (*Id.* at ¶ 50).  On September 12, 2017, Plaintiff submitted a written notice to retire to Defendant's superintendent indicating that she intended to retire in 60 days from the date of the letter, with an effective date of November 10, 2017.  (*Id.* at ¶ 51).  Defendant accepted Plaintiff's resignation and subsequently sent a letter to the parents and guardians of the students in the district on October 31, 2017, notifying them that Defendant had accepted Plaintiff's letter of resignation.  (*Id.* at ¶ 52).

Plaintiff agreed that she submitted her resignation voluntarily, that no one from Defendant forced her to retire, that no one threatened to terminate her if she did not retire, and that no one threatened to terminate her if she stayed but did not complete the improvement plan.  (*Id.* at ¶¶ 53-56).[7]

On September 29, 2017, Plaintiff filed a second charge of discrimination with the EEOC, alleging retaliation.  (*Id.* at ¶ 57).

---

[7] Plaintiff argues, however, that she retired "under duress."

Plaintiff's last day of work with Defendant was November 10, 2017.  (*Id.* at ¶ 58).

## III.   PROCEDURAL HISTORY

Plaintiff initiated this action by filing a Complaint on December 18, 2017. (Doc. 1).  Plaintiff then filed an Amended Complaint on January 11, 2018, (Doc. 8), which Defendant answered on January 16, 2018.  (Doc. 9).  Plaintiff's Amended Complaint alleges that she cross-filed charges of discrimination with the EEOC and Pennsylvania Human Relations Commission ("PHRC") and that she would seek leave to further amend her Complaint relative to the PHRC charge "at the end of [the Pennsylvania Human Relation Act's] one-year statutory waiting period."  (Doc. 8 at ¶ 19).  Notably, Plaintiff did not seek leave to amend as such, and, therefore, the only allegations before the Court are those pursuant to the ADEA for discrimination and retaliation.[8]

Defendant filed the instant Motion on April 1, 2019.  (Doc. 21).  The Motion has been fully briefed, (Docs. 23, 29, 33), and is ripe for our review.

## IV.   STANDARD OF REVIEW

Summary judgment is appropriate if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment

---

[8] We pause to note this because Defendant seeks dismissal of any PHRA claims for failure to exhaust administrative remedies.  However, there are no PHRA claims presently before the Court.

as a matter of law." FED. R. CIV. P. 56(a).  A dispute is "genuine" only if there is a

sufficient evidentiary basis for a reasonable jury to find for the non-moving party,

and a fact is "material" only if it might affect the outcome of the action under the

governing law.  *See Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162,

172 (3d Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)).  A court should view the facts in the light most favorable to the non-

moving party, drawing all reasonable inferences therefrom, and should not

evaluate credibility or weigh the evidence.  *See Guidotti v. Legal Helpers Debt*

*Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (citing *Reeves v. Sanderson*

*Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

    Initially, the moving party bears the burden of demonstrating the absence of

a genuine dispute of material fact, and upon satisfaction of that burden, the non-

movant must go beyond the pleadings, pointing to particular facts that evidence a

genuine dispute for trial.  *See id.* at 773 (citing *Celotex Corp. v. Catrett*, 477 U.S.

317, 324 (1986)).  In advancing their positions, the parties must support their

factual assertions by citing to specific parts of the record or by "showing that the

materials cited do not establish the absence or presence of a genuine dispute, or

that an adverse party cannot produce admissible evidence to support the fact."

FED. R. Civ. P. 56(c)(1).  Notably, however, a plaintiff cannot survive a motion for

summary judgment merely by pointing to the allegations in his complaint.  *Jackson*

*v. Taylor*, 467 F.App'x 98, 99-100 (3d Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)); *see also Nisenbaum v. Milwaukee Cnty.*, 333 F.3d 804, 810 (7th Cir. 2003) ("Allegations in a complaint are not evidence.").

A court should not grant summary judgment when there is a disagreement about the facts or the proper inferences that a fact finder could draw from them. *See Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010) (citing *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982)). Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 211 (3d Cir. 2011) (quoting *Anderson*, 477 U.S. at 247-48) (internal quotation marks omitted).

## V.   DISCUSSION

Plaintiff alleges both discrimination and retaliation under the ADEA. We will begin with a discussion of Plaintiff's discrimination claim.

### A.   Age Discrimination

The ADEA makes it "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The phrase "because of" has been construed as requiring proof of "but for" causation, which is, at all

times, the burden of a plaintiff to prove (i.e., the burden of persuasion).  *See Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 177 (2009) ("[T]he ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act.  To establish a disparate-treatment claim under the plain language of the ADEA, therefore, a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision."); *see also Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009).  Although the burden of persuasion remains with a plaintiff, the burden of *production* shifts in cases without direct evidence, according to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

> Under *McDonnell Douglas*, the plaintiff bears the burden of proof and the initial burden of production, having to demonstrate a prima facie case of discrimination by showing first, that the plaintiff is forty years of age or older; second, that the defendant took an adverse employment action against the plaintiff; third, that the plaintiff was qualified for the position in question; and fourth, that the plaintiff was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus.  Once the plaintiff satisfies these elements, the burden of production shifts to the employer to identify a legitimate, non-discriminatory reason for the adverse employment action.  If the employer does so, the burden of production returns to the plaintiff to demonstrate that the employer's proffered rationale was a pretext for age discrimination.  At all times, however, the burden of persuasion rests with the plaintiff.

*Smith*, 589 F.3d at 689-90 (internal citations omitted).

Here, Defendant concedes that Plaintiff was over forty years of age and was qualified for her position.  Furthermore, Plaintiff concedes, for purposes of the

Motion, that assuming she has shown a prima facie case, then Defendant has successfully proffered a legitimate, non-discriminatory reason for the adverse employment action she alleges. Thus, the points of contention before us concern whether Plaintiff actually suffered an adverse employment action, whether Plaintiff was replaced by someone sufficiently younger to support a discriminatory inference, both of which are elements of Plaintiff's prima facie case, and whether, Plaintiff has demonstrated that Defendant's non-discriminatory reason for the employment action was merely pretextual. We begin with the question of whether Plaintiff suffered an adverse employment action.

Plaintiff argues that both her transfer to second grade and her retirement "under duress" constitute adverse employment actions. Plaintiff suggests that her retirement should be construed as a constructive discharge.

An adverse employment action under the ADEA requires "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Swain v. City of Vineland*, 457 F.App'x 107, 110 (3d Cir. 2012) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). "While direct economic harm is probative, so, too, is conduct that substantially decreases one's earning potential or disrupts his working conditions." *Id.* (citing *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 153 (3d Cir. 1999)). A

"purely lateral transfer," however, "does not, by itself, constitute an adverse employment action." *Fallon v. Meissner*, 66 F.App'x 348, 351 (3d Cir. 2003) (citing *Brown v. Brody*, 199 F.3d 446, 455-57 (D.C.Cir. 1999); *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997); *Williams v. Bristol-Myers Squib Co.*, 85 F.3d 270, 274 (7th Cir. 1996)). Furthermore, "an employee's subjective preference for a different position is insufficient to establish an adverse employment action." *Woods v. Salisbury Behavioral Health, Inc.*, 3 F.Supp.3d 238, 250 (M.D. Pa. 2014) (Caputo, J.) (citing *Swain*, 457 F.App'x at 110-11; *see also Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 183 (6th Cir. 2004) (stating that "a plaintiff's subjective impression concerning the desirability of one position over another generally does not control with respect to the existence of an adverse employment action").

We first consider Plaintiff's transfer to second grade. As noted earlier, Plaintiff initially taught second grade as a substitute in 1978 but moved to kindergarten in 1982, where she had been until the transfer at issue. Plaintiff argues that Winemiller testified to the "appreciable difference" between teaching kindergarten and second grade. (Doc. 29 at 8). This is, at best, a questionable characterization of Winemiller's testimony. When asked if she thought there was "a big difference" between teaching kindergarten and second grade, she replied,

"No." (Ex. B at 28). When asked if she thought there was any difference at all, she responded:

> A. I do think that there is a difference. I think that every child is very different and that within a Kindergarten classroom you have students that are typical for Kindergarten, while others may be more typical for first grade or second grade and you could say the same for second. There are some kids that are typical second graders, while others appear to operate and function more as third graders, where others are operating more on the Kindergarten or first grade level.
>
> Q. Would you agree with me the curriculum is different for first [*sic*] graders versus Kindergartners?
>
> A. Yes
>
> Q. Would you agree with me that it requires experience to be able to accurately convey that curriculum to second grade students?
>
> A. I would agree that it requires teaching experience, but not second grade-specific experience.

(*Id.* at 28-29). Hollinger testified that grades kindergarten and second grade are both considered "primary," whereas higher grades in elementary school (i.e., fourth through sixth, and sometimes third), are considered "intermediate." (Ex. G at 21). Hollinger testified that "there is a significant difference when you move from primary to intermediate . . . . But I would say within . . . primary . . . the change would be relatively minor, only because of the change in content is not particularly significant." (*Id.*). He further testified that, for a teacher moving between grades within primary, he "would expect there to be some acclimation time, a few weeks, two to three weeks, but really that's more about realizing

developmental level of the children and setting processes in the classrooms." (*Id.* at 21-22). Hughes also testified that kindergarten and second grade are "still part of a primary grade level, so you are still working in the same relative general information. Once you hit third through fifth you are changing into more of an intermediate. So, the K through 2 is more primary. . . ." (Ex. D at 52). Winemiller, indeed, expressed the same sentiment when she agreed that a teacher could be expected to be "proficient in teaching second grade six weeks after starting and after teaching Kindergarten for 33 years." (Ex. B at 45). Furthermore, the parties agree that both kindergarten and second grade are within the scope of Plaintiff's professional certification.

Based on the above testimony, which Plaintiff did not contradict, the only reasonable inference is that a transfer from kindergarten to second grade is a *lateral* transfer, which "does not, by itself, constitute an adverse employment action." *Fallon*, 66 F.App'x at 351. Plaintiff presented no evidence that her compensation, benefits, opportunities for advancement, or basic working conditions were negatively altered by the transfer itself. Plaintiff, in fact, testified that even her "needs improvement" rating had no effect on her salary, tenure, pension, or other benefits. (Ex. A at 45-46). The record, therefore, is simply devoid of any evidence that Plaintiff's transfer from kindergarten to second grade was an adverse employment action.

Plaintiff next argues that her retirement, though voluntary, was "under duress" and, therefore, constitutes a constructive discharge. "To find constructive discharge, a court 'need merely find that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.'" *Lebofsky v. City of Philadelphia*, 394 F.App'x 935, 939 (3d Cir. 2010) (quoting *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 888 (3d Cir. 1984)).

> "Intolerability" is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign; presumably every resignation occurs before the employee believes that it is in his best interest to resign. Rather, "[i]ntolerability . . . is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt *compelled* to resign,' – that is, whether he would have had no choice but to resign.

*Connors v. Chrysler Financial Corp.*, 160 F.3d 971, 976 (3d Cir. 1998) (quoting *Blistein v. St. John's College*, 74 F.3d 1459, 1468 (4th Cir. 1996)). Several factors may indicate constructive discharge: "(1) threat of discharge; (2) suggesting or encouraging resignation; (3) a demotion or reduction of pay or benefits; (4) involuntary transfer to a less desirable position; (5) alteration of job responsibilities; and (6) unsatisfactory job evaluations." *Lebofsky*, 394 F.App'x at 939 (citing *Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993)).

The record shows no evidence that Plaintiff was threatened with discharge or that her retirement was suggested or encouraged.  She admitted that her pay and benefits were unchanged.  There is no evidence in the record that a second-grade position is objectively less desirable than kindergarten, even if Plaintiff would have preferred to stay in kindergarten.  Furthermore, as Hollinger, Hughes, and Winemiller testified, the job responsibilities of kindergarten and second grade are only minimally different.

Plaintiff stakes much of her claim on her "needs improvement" rating and the improvement plan that followed.  Plaintiff suggests that such a step taken against an experienced teacher would be construed by a reasonable juror as intolerable.  However, as noted above, the intolerability threshold is fairly high and requires actions that would *compel* a reasonable person to resign or retire, such that the person felt he or she had *no other choice* but to resign or retire.  Based on the record before us, no reasonable juror, in our view, would find as such.

Hollinger testified that the plan was intended to foster growth in the teacher for the benefit of students and would end when the identified goals were successfully completed.  (Ex. G at 64-67).  Winemiller stated that the plan's timeline was for measuring improvements at certain stages, and that there was no set timeline for when Plaintiff needed to show proficiency, that "if she was making improvement . . . that's what we were looking for."  (Ex. B at 55).  Winemiller

further explained that the plan "is not designed to be punitive. The plan is designed to offer assistance to allow [Plaintiff] to grow and give her the supports that she needed to be successful in the second grade classroom." (*Id.* at 38). There is no evidence that the improvement plan, alone, placed Plaintiff's employment prospects in jeopardy or that it was anything other than an action plan to improve on deficiencies noted in her observation. Indeed, although the test for constructive discharge is not subjective, we take note of Plaintiff's explanation for why she decided to retire: "Because I didn't want to put myself or the kids in my class through multiple observations and all of the expectations that I was expected to do through this plan." (Ex. A at 58). We find that no reasonable juror would construe the evidence as demonstrating constructive discharge. Quite likely, a reasonable person in Plaintiff's position may have felt a degree of embarrassment by being compelled to participate in the improvement plan, as Plaintiff no doubt was, but would not, based on this evidence, have felt that he or she had no choice but to retire.

We find, therefore, that Plaintiff has not demonstrated an adverse employment action and, consequently, has not established a prima facie case of age discrimination. Because Plaintiff has not satisfied her initial burden of production, we need not continue in our analysis of the discrimination claim and will turn, now, to her retaliation claim.

## B.    Retaliation

To establish a prima facie case of retaliation under the ADEA, "a plaintiff must show (1) that s/he engaged in a protected employee activity; (2) that s/he was subject to adverse action by the employer either subsequent to or contemporaneous with the protected activity; and (3) that there is a causal connection between the protected activity and the adverse action." *Fasold v. Justice*, 409 F.3d 178, 188 (3e Cir. 2005) (citing *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002)).

No one disputes that the first element is satisfied by Plaintiff's filing of an EEOC charge of discrimination. The second element, though, requires an adverse employment action *subsequent to or contemporaneous with* the filing of the EEOC charge. Here, Plaintiff's transfer to second grade and the initial preparation of the improvement plan occurred *before* Plaintiff's EEOC charge and, as we found earlier, do not constitute adverse employment actions. Plaintiff argues that "a reasonable jury might well believe that Defendant engaged in a period of ongoing antagonism towards the Plaintiff that only amplified after she filed an EEOC charge." (Doc. 29 at 15). We disagree. The record shows that Plaintiff filed her EEOC charge while on FMLA leave. Upon her return from leave, Defendant delayed implementation of the improvement plan until the next school year and only performed informal walk-throughs. The next school year, the previously

designed improvement plan was revised to reflect new target dates. During the meeting with Plaintiff to discuss the reinstated plan, Plaintiff announced her intention to retire and not abide by the plan. We fail to see how any reasonable juror would view this evidence and see an "amplification" of "ongoing antagonism" toward Plaintiff.

Thus, the record also does not demonstrate any adverse employment action to support Plaintiff's retaliation claim. With no evidence of an adverse employment action, Plaintiff's claim necessarily fails.

## VI. CONCLUSION

For the foregoing reasons, we shall grant Defendant's Motion for Summary Judgment. (Doc. 21). A separate order shall issue in accordance with this ruling.